IN THE SUPREME COURT OF THE STATE OF IDAHO
Docket No. 42742

THE ESTATE OF: KURT AIKELE (Deceased), )
)
)
    Claimant-Appellant, )
)
v. )
)
CITY OF BLACKFOOT, Employer, and )
IDAHO STATE INSURANCE FUND, Surety, )
)
    Defendants-Respondents. )
)

Boise, December 2015 Term

2016 Opinion No. 101

Filed: September 13, 2016

Stephen W. Kenyon, Clerk

Appeal from the Industrial Commission.

Industrial commission decision denying workers compensation benefits, <u>affirmed.</u>

Curtis & Porter, PA, Idaho Falls, for appellant. Andrew A. Adams argued.

Fuller & Fuller, PLLC, Preston, for respondents. Steven R. Fuller argued.

_____

BURDICK, Justice

This is an appeal of the Idaho Industrial Commission's Decision and Order holding that Aikele was not entitled to workers' compensation benefits because he failed to prove that his occupation caused him to develop lung cancer. We affirm the Industrial Commission's order.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Kurt Aikele worked as a firefighter for the City of Blackfoot for twenty-six years. In December 2008, Aikele was diagnosed with adenocarcinoma of the lung, which caused his death on December 8, 2012. Before his death, Aikele filed a workers' compensation claim (later amended to include death benefits), arguing that as a lifelong non-smoker with no known genetic predisposition for lung cancer, his disease was likely caused by on-the-job exposure to carcinogens.

One of Aikele's duties was to regularly participate in the "mop-up" process, which required cleaning up the fire area after the fire was out and looking for hot spots under smoldering debris. According to Dr. Dane Dickson, Aikele's treating oncologist, Aikele wore a

1

self-contained breathing apparatus (SCBA) during active fires, but not during mop-up. Dr. Dickson also testified that Aikele spent "many, many hours" in a poorly-ventilated fire station garage breathing diesel engine fumes.

The Idaho State Insurance Fund submitted two experts' conclusions to the Commission. The first, George Pfoertner, M.D., reviewed Aikele's medical records and scientific literature addressing cancer among firefighters. Dr. Pfoertner concluded it was "more probable than not" that Aikele's cancer was unrelated to his work. The second expert consulted, oncologist Norman Zuckerman, M.D., reviewed Aikele's medical records and performed an independent medical exam. Dr. Zuckerman concluded that Aikele's cancer was "unlikely to be related to his occupation as a firefighter." He also produced a copy of a meta-analysis of thirty-two scientific studies of cancer risk in firefighters, which he opined was the "best and most thorough" available. The meta-analysis concluded that firefighters have no greater risk of developing lung cancer than the general population. Additionally, Dr. Zuckerman testified that it was impossible to determine what caused Aikele's cancer without more information about his exposure to potential carcinogens, in part because around fifteen percent of lung cancers occur in non-smokers with no occupational risk factors.

Additionally, at the hearing before the Industrial Commission Referee, Aikele's supervisor, Kevin Gray, testified that although department policy required firefighters to wear SCBAs while responding to fires, individual preference often determined whether they were worn during mop-up. Gray also stated that the fire department installed a ventilation system for the diesel-powered equipment several years ago. Before that, it was standard procedure to open the bay doors while the equipment was running. Nonetheless, Gray said he did not notice any diesel odor in the firehouse's living areas.

However, Dr. Dickson repeatedly opined that he believed Aikele's occupation caused his cancer and wrote that "I feel the review I have done . . . is enough to say there can be a presumptive risk of cancer although it may not be enough to establish a definitive relationship." Additionally, after Dr. Dickson noted it was impossible to be certain what caused Aikele's cancer, he wrote that "I readily admit that I am not an expert in this field, but feel strongly that there is more than a casual relationship between [Aikele's] occupation and the possible development of his malignancy." Dr. Dickson also questioned the meta-analysis's applicability because it did not state whether the firefighters studied performed the same work as Aikele,

2

particularly mop-up. Instead, Dr. Dickson testified that his opinion was based on what he knew about Aikele's individual case and cautioned against overreliance on meta-analyses because their focus on large collections of data makes them difficult to apply to individual cases.

The Commission's Referee held a hearing on December 4, 2013, to determine if Aikele's occupation caused his cancer and concluded that Aikele failed to demonstrate a causal relationship between the two. On October 22, 2014, the Industrial Commission issued its own Findings of Fact and Conclusions of Law and entered an Order denying Aikele's claim.

The Commission was persuaded by Dr. Zuckerman's explanation of the meta-analysis's conclusion because he "particularly identified both general and specific factors which support his opinion." Additionally, the Commission found that Dr. Dickson lacked "a factual basis . . . to support his opinion" and his testimony demonstrated "willingness to abandon science in favor of his emotional wish on [Aikele's] behalf." The Commission also determined that Chief Gray's testimony contradicted Aikele's claim that he inhaled diesel fumes inside the firehouse for eighteen years before the ventilation system's installation. Further, the Commission found that Aikele "initially reported to physicians that he 'always' used personal protective equipment," and only added later that he did not always do so during the mop-up phase. The Commission concluded the lack of details regarding what chemicals and in what amounts Aikele was exposed to, as well as the fact that no other Blackfoot firefighter had developed cancer, favored Dr. Zuckerman's and Dr. Pfoertner's opinions. To "fill these gaps and find for compensability," the Commission reasoned it would be "forced to make assumptions favorable to [Aikele]." As a result, the Commission held that Aikele did not meet "his burden of proving that it is more probable than not" that his work caused his lung cancer and thus "failed to meet the requirements of Idaho Workers' Compensation Law." Aikele timely filed this appeal on November 20, 2014.

## II.    ISSUES ON APPEAL

1. Whether the Commission's findings of fact are clearly erroneous.
2. Whether the Commission's order is supported by substantial and competent evidence.
3. Whether the Commission's application of Idaho Code section 72-438(12) is erroneous as a matter of law.
4. Whether Aikele is entitled to attorney's fees.

3

### III.    STANDARD OF REVIEW

On appeal, this Court reviews "whether the Commission's findings of fact are supported by substantial and competent evidence," but freely reviews its legal conclusions. *Shubert v. Macy's W., Inc.*, 158 Idaho 92, 98, 343 P.3d 1099, 1105 (2015), *abrogated on other grounds by Chavez v. Stokes*, 158 Idaho 793, 353 P.3d 414 (2015). "Substantial and competent evidence is relevant evidence which a reasonable mind might accept to support a conclusion." *Id.* "We will not disturb the Commission's findings on the weight and credibility of the evidence unless those conclusions are clearly erroneous," *id.*, nor will this Court "re-weigh the evidence or consider whether we would have drawn a different conclusion from the evidence presented." *Watson v. Joslin Millwork, Inc.*, 149 Idaho 850, 854, 243 P.3d 666, 670 (2010). All facts and inferences are viewed in the "light most favorable to the party who prevailed before the Commission." *Hamilton v. Alpha Servs.*, 158 Idaho 683, 688, 351 P.3d 611, 616 (2015). However, workers' compensation laws are liberally construed "in favor of the employee, in order to serve the humane purpose" behind the law. *Id.*

### IV.    ANALYSIS

Aikele argues the Commission's decision is not supported by substantial and competent evidence because several of its factual findings are clearly erroneous. He also contends the Commission erred because Idaho Code section 72-438(12) establishes that a firefighter's lung cancer is compensable as a matter of law and to hold otherwise would bar other firefighters with cancer from recovering under the statute.

**A. The Commission's holding is supported by substantial and competent evidence.**

Aikele makes two arguments concerning the Commission's factual findings, which we address in turn. First, he contends that several of the Commission's findings are inaccurate and clearly erroneous, and second, he argues that the Commission's decision was not based on substantial and competent evidence.

1.  The Commission's factual findings were not clearly erroneous.

Aikele argues that a number of the Commission's factual findings are incorrect or not supported by evidence in the record, including the conclusions it drew from the meta-analysis, the contents and credibility of the experts' opinions, and the evidence's relative weight. "The Commission's conclusions regarding the credibility and weight of evidence will not be disturbed

4

unless the conclusions are clearly erroneous." *Oxley v. Med. Rock Specialties*, 139 Idaho 476, 479, 80 P.3d 1077, 1080 (2003).

First, Aikele disputes the Commission's finding that "studies and data show no statistically significant incidence of lung cancer in firefighters" because the meta-analysis addresses risk, not causation. Idaho State Insurance Fund argues this is a "distinction without a difference" because reviewing multiple studies is the most reliable way to assess what causes an individual cancer. Dr. Zuckerman gave the following summary of the meta-analysis's conclusion: "The authors conclude that there is an increased risk of non-Hodgkin lymphoma, multiple myeloma and malignant myeloma. However, the relative risk of lung cancer was 1.05, which is not statistically significant based on this extensive meta-analysis." Additionally, the meta-analysis itself characterizes its objective as being to "quantitatively and qualitatively determine the cancer risk" of firefighters. Thus, the meta-analysis focused on cancer risk, as Aikele asserts.

Although the meta-analysis speaks directly to firefighters' cancer risk, as opposed to causation, both doctors stated there is no way to determine any specific cancer's cause, only whether it is more or less likely to occur based on known associations between risk factors and cancer development. Because it is impossible to directly analyze causation, research must focus on examining the variables available. Dr. Dickson testified that accepted correlations, such as the relationship between smoking and lung cancer, were discovered by studying the "strong association" revealed through the "body of information that has been obtained over many, many years." The meta-analysis, which concluded no similar association exists between firefighting and lung cancer, is the most comprehensive body of information available in the record. Thus, the Commission's consideration of a risk analysis was appropriate under the circumstances.

Second, Aikele disputes the Commission's finding that the testifying doctors "did not show [Aikele's] work differed from the firefighters studied in any material way" because neither doctor knew if the firefighters who the meta-analysis studied participated in the mop-up process. Although the meta-analysis does not list the studied firefighters' duties, it does state that "firefighters are exposed to harmful substances at the fire scene as well as at the firehouse," including "various mixtures of particulates, gases, mists, fumes of an organic and/or inorganic nature, and the resultant pyrolysis products." Dr. Zuckerman testified that he believed this indicated that the study accounted for a variety of possible exposures. Thus, a reasonable basis

existed for the Commission to find the meta-analysis fairly represented most, if not all, of Aikele's duties. Furthermore, because the analysis does not elaborate on the firefighters' individual tasks, Aikele cannot demonstrate that his own work was not accounted for, which supports the Commission's finding that he failed to do just that.

Aikele also disputes the Commission's characterization of Dr. Dickson's opinion. Aikele argues the Commission incorrectly found that Dr. Dickson lacked specific knowledge regarding Aikele's exposures and "did not have sufficient historical data" to determine what caused Aikele's cancer. Aikele contends Dr. Dickson learned these details during several discussions with Aikele about his job and the mop-up process. However, Dr. Dickson could not elaborate on specific carcinogenic compounds or Aikele's particular exposures, and lacked "any first-hand knowledge" regarding Aikele's contact with diesel fumes. Dr. Dickson's most specific statement on this topic was that during the mop-up process, Aikele encountered "many things that were still smoldering," including wood products, electrical equipment, and "other potential toxins and exposures and many things we could not even identify because of everything that would be involved in a fire." As Dr. Dickson could not provide details regarding specific substances or the duration of Aikele's exposure, it was reasonable for the Commission to conclude he lacked specific data to support his opinion.

Aikele also challenges the Commission's finding that Dr. Dickson's opinions were based on patient advocacy rather than science. Aikele counters this finding with examples of scientific terminology from Dr. Dickson's testimony:

> I believe that his environmental exposures were substantial and *were more likely than not to have led him to a muta-genesis in his lungs* that created lung cancer much higher than anything else I can think of.
> . . . .
> But I'm arguing for one individual patient to say—once again, if I look at one individual patient, I have got to say from *everything I know about the development of lung cancer* that it just makes sense to me that he had a toxic exposure that created him at a place where he could develop this.

Arguably, Dr. Dickson made at least two statements that could reasonably be interpreted as advocacy. First, he wrote a letter to Aikele with advice and research that he said "could potentially help you in your fight." Second, in a letter to Aikele's attorney, Dickson urged him to "[p]lease provide [Aikele] every assistance possible." There would seem to be little or no evidence for advocacy as much as concern for a dying patient.

6

Additionally, Aikele argues the Commission erred when it found he "initially reported to physicians that he 'always' used protective equipment" because Dr. Dickson testified that Aikele did not wear the equipment during mop-up. At his first appointment with Aikele, Dr. Dickson wrote, "[a]lthough he has been religious in wearing his equipment during fires, he is required to walk through post-fire scenes in clean-up." Dr. Zuckerman wrote to the ISIF that "[r]espiratory gear has been used he states since his initial employment." Dr. Pfoertner wrote that Aikele "admitted that over the past 18 years he has worn a fully contained breathing apparatus, whenever he performed interior firefighting work." Thus, while the evidence suggests Aikele wore his SCBA frequently, it is unclear if he "always" did.

Nonetheless, Aikele's use of protective equipment did not significantly affect the Commission's decision. The Commission noted that "[t]his change in recollection did not impair the Referee's assessment of [Aikele's] credibility," and it saw "no reason to disturb the Referee's findings and observations on [Aikele's] presentation or credibility." Although the Commission found this "impair[ed] the basis" for Dr. Dickson's opinion, its concern that he lacked specific knowledge about "whether, when, or how much [Aikele] was exposed to unknown—potentially carcinogenic—compounds" is otherwise well-supported.

Aikele also contends the Commission erred when it found the list of fires he responded to did not include dates, times, specific carcinogenic compounds Aikele may have encountered, or the corresponding exposure levels. Aikele correctly points out that the record does indicate the dates, times, and types of calls (e.g., "structure" versus "grass" and so on). While acknowledging that the log does not inventory specific carcinogens, Aikele offers a list of possible chemical exposures common among firefighters in the meta-analysis as a substitute. He argues that "[s]ince the Commission is relying on the assumptions in the meta-analysis [regarding cancer risk], then they must also assume that, like the meta-analysis suggests, firefighters are exposed to an array of carcinogenic compounds." However, the Commission was concerned with the lack of information regarding Aikele's specific exposures, not just possible exposures common to a large group of firefighters. As the meta-analysis does not address Aikele specifically or suggest how much of these substances any individual might be exposed to, it does not fill that gap. Furthermore, Aikele's argument that the Commission's reliance on any part of the analysis requires reliance on all of it undermines the Commission's role as factfinder to determine the weight each piece of evidence is entitled to.

Finally, Aikele argues the Commission's finding that Gray's testimony contradicted Aikele's claim that he was exposed to diesel fumes in the firehouse is "false and misleading." He contends that "Chief Gray testified that the diesel fumes were currently not present in the firehouse at the date of the hearing on December 4, 2013," but that the area was unventilated until nine years prior. This argument is not persuasive. Gray said that "you'd open the . . . bay doors when you fire up equipment. That was just pretty much standard procedure." The Referee followed up by asking, "And did you notice a problem, an odor of diesel fumes in the living areas?" to which Gray replied, "I haven't." Although Gray's response was phrased in the present tense, which arguably supports Aikele's position, he was responding to a past-tense question and had just testified to procedures that preceded the ventilation system's installation. As a result, Gray's answer most likely referred to that time frame, not the date of the hearing. Since Aikele complained that he breathed diesel fumes at the firehouse, but Gray testified that he did not notice any, it was reasonable for the Commission to find that they contradicted each other.

Therefore, the disputed factual findings are reasonable and supported by the record. Accordingly, we conclude that the Commission's findings of fact were not clearly erroneous.

2. The Commission's order was supported by substantial and competent evidence.

Aikele also argues that the Commission's decision was not based on substantial and competent evidence. Specifically, Aikele contends the Commission's finding that his cancer likely resulted from either occupational exposure or bad luck is inconsistent with its conclusion that he failed to meet his burden of proving his work caused his illness, particularly because Dr. Zuckerman testified that his cancer was "85% environmental."

The Commission's findings must be supported by substantial and competent evidence, which is "relevant evidence that a reasonable mind might accept as adequate to support a conclusion." *Stewart v. Sun Valley Co.*, 140 Idaho 381, 384, 94 P.3d 686, 689 (2004). However, "reviewing courts should not read only one side of the case and, if they find any evidence there, sustain the administrative action and ignore the record to the contrary." *Id.*

Nonetheless, the claimant has the burden of proving a causal connection between his work environment and an occupational disease "to a reasonable degree of medical probability." *Wichterman v. J.H. Kelly, Inc.*, 144 Idaho 138, 141, 158 P.3d 301, 304 (2007). "In this regard, 'probable' is defined as 'having more evidence for than against.' " *Jensen v. City of Pocatello*, 135 Idaho 406, 412, 18 P.3d 211, 217 (2000) (quoting *Soto v. Simplot*, 126 Idaho 536, 540, 887

P.2d 1043, 1047 (1994)). Proof of a possible causal link is not sufficient to satisfy this burden. *Id.* Expert medical testimony is required, "although the Industrial Commission as the finder of fact may consider other evidence as well, including evidence regarding credibility." *Id.* The Commission is "free to determine the weight" to give an expert opinion. *Eacret v. Clearwater Forest Indus.*, 136 Idaho 733, 737, 40 P.3d 91, 95 (2002). When deciding how much weight an opinion is entitled to, "the Commission can certainly consider whether the expert's reasoning and methodology has been sufficiently disclosed and whether or not the opinion takes into consideration all relevant facts." *Id.*

The Commission found Aikele failed to meet his burden of proof after examining the meta-analysis, expert opinions from Drs. Zuckerman, Pfoertner, and Dickson, and Gray's testimony. The Commission concluded that Dr. Zuckerman's and Dr. Pfoertner's opinions were more persuasive than Dr. Dickson's, particularly because Dr. Zuckerman "identified both general and specific factors" to support his analysis. Although Dr. Dickson's opinion received "serious attention," the Commission found his criticism of the meta-analysis unpersuasive because he did "not have a factual basis about whether, when, or how much [Aikele] was exposed to unknown—potentially carcinogenic—compounds to support his opinion." Additionally, the Commission found Gray's testimony contradicted Aikele's statements that he did not always wear protective equipment and was exposed to diesel fumes in the firehouse.

Aikele compares the Commission's conclusion that he did not prove his cancer was related to his occupation with another of the Commission's findings:

> Thus, having eliminated the cause of the overwhelming majority of lung cancer cases—tobacco smoke—we are left to compare the likelihood of various minority causes. *The physicians agree that the most significant among the potential remaining causes are occupational exposure and bad luck*; there are potentially a multitude of other minor causes, a few of which have been ruled out by testifying physicians.

He contends that "[a] reasonable mind cannot accept one conclusion without discrediting the other" because "[t]he physicians agree that the most significant among the potential remaining causes [is] occupational exposure." However, Aikele's argument omits the portion of the quoted sentence that does not support his claim. The physicians agreed that lung cancer has three major causes: genetic predisposition, environmental exposure (including tobacco use), and bad luck. Having ruled out genetics and tobacco, Aikele argues that occupational exposure is the only

9

remaining cause. However, neither doctor eliminated the possibility that bad luck caused Aikele's disease.

Furthermore, Aikele argues a decision in his favor "is well founded in the record, as Dr. Zuckerman opined that Mr. Aikele's cancer was 85% environmental." However, this misstates Dr. Zuckerman's testimony, which was that "80 to 90 percent" of lung cancers are caused by smoking or environmental factors while "another 10 to 15 percent" occur with "no demonstrable exposure to carcinogens." This testimony does not address the likelihood that either of these possibilities applies to Aikele's individual cancer, but rather the percentage of all lung cancers attributable to different factors.

Aikele also takes issue with the Commission's reliance on the meta-analysis, calling it a "red herring" because it addresses cancer risk, not causation. The Commission noted that Dr. Zuckerman explained the report's strengths and weaknesses, including the fact that it is a "statistical analysis which is very difficult to apply to an individual patient." However, Dr. Zuckerman also testified to the "the impossibility of establishing a likely causal link between [Aikele's] cancer and his work without significant information about the extent to which he was exposed to potential carcinogens."

Aikele attempts to illustrate his point with a hypothetical situation where a paralegal hurts her back lifting files, but cannot recover for her injury because a meta-analysis indicates that paralegals don't suffer back injuries more often than the general public. However, this comparison is flawed because the hypothetical paralegal can identify and report when and how her injury occurred to rebut the meta-analysis's conclusion. Aikele, on the other hand, provided no comparable information about specific incidents or exposures that could have caused his cancer.

Aikele also argues the Commission should have given more weight to Dr. Dickson's testimony because he addressed causation in terms of Aikele's individual risk factors, such as smoking, radon exposure, where he grew up, and the pollution levels in southeast Idaho. However, the weight and credibility of expert testimony is for the Commission to decide. The Commission found Drs. Zuckerman and Pfoertner's conclusions more persuasive than Dr. Dickson's and particularly decided that Dr. Zuckerman's opinion was "entitled to great weight" because he described the meta-analysis's strengths and weaknesses, considered the lack of other lung cancer diagnoses among Blackfoot firefighters, and "well explained the bases for his

10

opinion." On the other hand, the Commission found Dr. Dickson's testimony less convincing because he did not have specific information supporting his argument that the meta-analysis is not applicable to Aikele's work. This is precisely the kind of weighing and fact-finding the Commission is tasked with performing.

The evidence shows that a group of studies indicates that firefighters are at no greater risk than any other population segment for developing lung cancer. Additionally, two medical experts testified that it is impossible to determine precisely what caused Aikele's cancer, only what is likely. The Commission found that one reached his conclusion after examining a variety of factors and scientific studies. The other based his opinion on his personal knowledge of the claimant. As a result, a reasonable mind could accept that the meta-analysis, Drs. Zuckerman's and Pfoertner's opinions, and Gray's testimony provide more evidence against Aikele's claim than Dr. Dickson's opinion provides for it. Thus, this Court holds that the Commission's conclusion is supported by substantial and competent evidence.

**B. The Commission's application of Idaho Code section 72-438(12) was not erroneous as a matter of law.**

Aikele argues the Commission committed a legal error because Idaho Code section 72-438(12) establishes that firefighters are at risk for pulmonary diseases, like lung cancer, as a matter of law, and that the burden of proof the Commission applied imposed an impossible standard upon claimants that defeats the statute's purpose.

An occupational disease is "due to the nature of an employment in which the hazards of such disease actually exist, are characteristic of, and are peculiar to the trade, occupation, process, or employment . . . ." I.C. § 72-102(22)(a). Employers are not liable for occupational diseases "unless such disease is actually incurred in the employer's employment." I.C. § 72-439(1). When referring to an occupational disease, the term "incurred" means " 'arising out of and in the course of' employment," which refers in part to causation. I.C. § 72-102(22)(b); *Sundquist v. Precision Steel & Gypsum, Inc.*, 141 Idaho 450, 456, 111 P.3d 135, 141 (2005). The claimant has the burden of proving his work environment caused his occupational disease. *Wichterman*, 144 Idaho at 141, 158 P.3d at 304. Idaho Code section 72-438 provides a lengthy list of possible occupational diseases, including "[c]ardiovascular or pulmonary or respiratory diseases of a paid fireman . . . caused by . . . proximate exposure or by cumulative exposure over

a period of four (4) years or more to heat, smoke, chemical fumes or other toxic gases arising directly out of, and in the course of, his employment." I.C. § 72-438(12).

Aikele argues the "Commission ignored the statutes on pulmonary disease being associated with firefighters" and asked him to "carry an even heavier burden than required" because the evidence demonstrated that he was "exposed to hundreds of carcinogenic fires" as well as diesel fumes.

The statute's text states that in order to recover, a firefighter's respiratory or pulmonary disease must be "caused by" exposures encountered in the course of his employment. I.C. § 72-438(12). Even absent this language, Idaho Code sections 72-439(1) and 72-102(22)(b) would impose the same requirement. Thus, Aikele needed to show that his lung cancer was caused by his firefighting work. However, the Commission found that Aikele's medical expert was unable to provide sufficient information to meet this burden. Dr. Dickson did not provide specific evidence detailing what substances or in what amounts Aikele encountered during the "hundreds of carcinogenic fires" he references. Additionally, the Commission determined that Gray's testimony contradicted Aikele's statements concerning diesel fume exposure. Furthermore, the Commission found the meta-analysis, Dr. Pfoertner's report, and Dr. Zuckerman's testimony more convincing than Dr.Dickson's testimony. Accordingly, the Commission, as factfinder, determined there was more evidence against Aikele's claim than for, and thus concluded he did not support his claim to a reasonable degree of medical probability. By providing evidence in Aikele's favor, Dr. Dickson's testimony successfully raised the possibility that his exposures contributed to his lung cancer, but this is not sufficient to meet the burden of proof.

The Commission's findings and conclusions indicate that the Commission asked Aikele to prove that his work as a firefighter caused his cancer, which is consistent with the plain language of Idaho Code section 72-438(12) and other statutes governing occupational diseases. As a result, the Commission did not "ignore" the statute or require Aikele to carry a more onerous burden of proof than the law requires.

Finally, Aikele argues that requiring firefighters to demonstrate a connection between their occupation and their cancer essentially asks them to prove the impossible, precluding any chance of recovery under the occupational disease statutes. Aikele is correct that both testifying doctors verified there is no method for proving exactly what causes any individual cancer. However, the proof required to establish causation is not airtight certainty, but medical testimony

stating it is more probable than not that a claimant's disease arose out of the course of his occupation, where "probable" means there is more evidence for the claimant than against. At least hypothetically, claimants can meet their burden by providing expert testimony or other evidence that the Commission finds more credible or that otherwise outweighs the defendant's evidence.

As the burden of proof the Commission imposed is consistent with the text of Idaho Code section 72-438(12) and other occupational disease statutes, we hold that the Commission applied the correct standard and therefore did not err as a matter of law.

## C. Aikele is not entitled to attorney's fees under Idaho Code section 72-313.

Aikele requests attorney's fees under Idaho Code section 72-313. However, his entire argument supporting this request states, "[a]ttorney's fees are requested per I.C. [§] 72-313."

"The mere citation to a code provision, without explaining how the cited code section provides for an award in the case or providing argument of how the section applies to the circumstances in the case, is insufficient for an award of attorney fees on appeal." *Clark v. Shari's Mgmt. Corp.*, 155 Idaho 576, 583, 314 P.3d 631, 638 (2013). Additionally, the code provision Aikele cites to is "unrelated to awards of attorney fees." *Id.* (citing *Bradford v. Roche Moving & Storage, Inc.*, 147 Idaho 733, 736, 215 P.3d 453, 456 (2009) ("Claimant requests an award of attorney fees pursuant to Idaho Code § 72-313. That statute has nothing to do with the awarding of attorney fees.")). Finally, Aikele has not prevailed in this appeal. Accordingly, we deny Aikele's request for attorney's fees.

## V.    CONCLUSION

With deep sympathy for this first responder's family, this Court affirms the Industrial Commission's decision denying Aikele's claim on the basis that he failed to prove that his occupation caused him to develop lung cancer. Costs to the Respondents.

Justices EISMANN and HORTON, **CONCUR.**

J. JONES, Chief Justice, dissenting.

I respectfully dissent from the opinion of the Court because (1) the Industrial Commission relied in its decision upon Idaho Code section 72-439, apparently being unaware that it does not apply in this case, and (2) I believe the opinion fails to properly distinguish risk from causation and interprets Idaho Code section 72-438(12) in a manner inconsistent with its

13

language and purpose. The result is that firefighters facing diagnoses similar to Aikele's will be precluded from recovery and this statutory provision will be effectively rendered useless.

In setting forth the applicable law, the Commission stated:

Under Idaho Code § 72-439, an employer cannot be held liable for an occupational disease unless such disease is actually "incurred" in that employment. Therefore, as an accident/injury case, one who claims benefits for an occupational disease must show that he developed a disease while performing the work he was employed to perform and that there is a causal connection between the conditions under which the work was performed and the resulting disease.

However, Idaho Code section 72-438 specifically provides that "the diseases enumerated in subsection (12) of this section pertaining to paid firemen *shall not* be subject to the limitations prescribed in section 72-439, Idaho Code." (emphasis added). The requirement that a claimant prove his or her disease was "actually incurred" in the employment is inapplicable where the occupational disease claimed is a "[c]ardiovascular or pulmonary or respiratory disease[] of a paid fireman . . . caused by . . . proximate exposure or by cumulative exposure over a period of four (4) years or more to heat, smoke, chemical fumes or other toxic gases." I.C. § 72-438(12). The Legislature's exclusion of subsection (12) from the usual mandates of section 72-439 was not discussed or even mentioned by the Industrial Commission in its decision. I would send the case back to the Commission for reconsideration, based upon the statutes enacted by the Legislature.

Failing a remand of the case for consideration under the applicable law, I disagree with the Court's analysis. The Court's opinion accepts that in the absence of any method to pinpoint a cancer's cause, a risk analysis suffices. However, risk is a wholly distinct concept from causation. Risk is defined as "[t]he uncertainty of a result" or "the chance of injury, damage, or loss," particularly as it concerns "the existence and extent of the possibility of harm." BLACK'S LAW DICTIONARY 1442 (9th ed. 2009). A cause, however, is "[s]omething that produces an effect or result." *Id.* at 250. Thus, risk is essentially the uncertain *possibility* that something might occur; a cause is the reason why it actually did. Results do not always follow risks, but every result does have a cause, even when risk analysis deems that result unlikely.

Counsel for ISIF argued before the Commission and this Court that risk based upon a meta-analysis *is* causation. This is incorrect. For example, studies likely show that if I drive on an icy, snowy highway, I am at an increased risk of being involved in a collision with another

vehicle or sliding off the road. In other words, there is a chance my car may slide on the ice. However, if I hit a deer on the same snowy, icy highway, then that deer is the actual cause of my accident and the possibility that I could have slid off the road instead is irrelevant. The risk analysis had nothing to do with the deer and does not negate the result, even though it failed to predict it. By the same token, the meta-analysis' conclusion that Aikele's job did not increase his lung cancer risk has nothing whatsoever to do with, nor any effect on, his cancer's actual cause.

Of course, it is undisputed, like many diseases, that no one knows any cancer's specific cause. Dr. Zuckerman said, "[i]n an individual patient we never know precisely what caused the cancer." Similarly, Dr. Dickson testified that "[one] hundred percent certainty in oncology is near[ly] impossible to have," and explained that even among smokers with lung cancer, "there is no way of knowing for sure if the smoking caused that lung tumor" other than the "strong association" revealed through the "body of information that has been obtained over many, many years." Even then, oncology's inherent uncertainty all but proves the old adage, "correlation is not causation." Thus, even if the meta-analysis reached the opposite conclusion and found that firefighting *was* associated with an increased risk of lung cancer, it still would not indicate whether Aikele's cancer resulted from his occupation. Consequently, the meta-analysis cannot answer this case's central question.

Although science cannot yet pinpoint the cause for one person's cancer, it does know a few things about most people's cancers. For instance, Dr. Zuckerman testified that 85% of lung cancer is attributable to environmental factors. Therefore, only ten to fifteen percent of lung cancers occur without exposure to carcinogens. Accordingly, nearly all cancers more likely than not result from some type of environmental exposure. If the general population's most significant environmental factor is smoking, but the patient does not smoke, and genetic predisposition is ruled out, the remaining culprits are other environmental factors or bad luck. Although bad luck cannot be ruled out, Dr. Zuckerman's opinion indicates that it is relatively rare. Consequently, it is more likely than not that any non-smoker's lung cancer resulted from environmental factors.

Other environmental factors that commonly correlate with lung cancer include air pollution and automobile exhaust. Dr. Dickson testified that the air pollution in southeast Idaho is unlikely significant enough to have contributed to Aikele's illness. However, as a career firefighter, Aikele "had extensive exposure to occupational smoke including fires." Even without precise details regarding what chemicals Aikele was exposed to, smoke from structure and grass

fires is clearly Aikele's most significant environmental risk factor. If environmental factors are the most plausible explanation for Aikele's cancer and his greatest environmental exposure arose from his work, then Aikele has shown that it is more likely than not that his firefighting career caused his illness, and thus met his burden of proof.

Idaho Code section 72-438(12)'s language indicates that the Legislature intended to account for these realities. That statute lists several occupational diseases, including "[c]ardiovascular or pulmonary or respiratory diseases of a paid fireman . . . caused by . . . proximate exposure or by cumulative exposure over a period of four (4) years or more to heat, smoke, chemical fumes or other toxic gases arising directly out of, and in the course of, his employment." I.C. § 72-438(12). Under this text, the claimant must provide evidence that while working as a firefighter, he experienced "cumulative exposure . . . to heat, smoke, chemical fumes or other toxic gases" for at least four years. Common sense indicates that firefighters working with active fire scenes and their immediate aftermath are necessarily exposed to a multitude of chemicals and gases. However, the statute provides no guidance as to what substances, or in what amounts, are sufficient to recover or attribute causation to those exposures. Similarly, there is also no measurement suggested for what rises to "cumulative exposure" other than it must have occurred over four years.

Furthermore, when the entire section is read in context, section 72-438(12) notably differs from the other occupational disease subsections, which list specific diseases, contracted from specific chemicals, in (often unspecified) occupations that require such contact. *See* I.C. § 72-438(1)–(11). In contrast, subsection (12) covers a specific occupation, and where the other sections require exposure to certain substances, it substitutes the less-definitive prerequisite "cumulative exposure . . . to heat, smoke, chemical fumes or other toxic gases." This lack of specificity indicates that the Legislature intended that firefighters suffering from cardiovascular, respiratory, or pulmonary diseases should not be subjected to the same burden of proof as claimants with diseases with more specific, traceable origins. Additionally, it accounts for the reality that no firefighter can record and recount the substances he encountered over many years during emergency situations, often involving substantial destruction that make identifying those substances impossible.

Accordingly, Idaho Code section 72-438(12) required that Aikele show: (1) he was a paid fireman for the City of Blackfoot; (2) he suffered from a cardiovascular, pulmonary, or

16

respiratory disease; (3) he experienced at least four years' worth of cumulative exposure to "heat, smoke, chemical fumes or other toxic gases"; and (4) such exposure arose "directly out of, and in the course of, his employment." I.C. § 72-438(12). It is undisputed that Aikele died from lung cancer, a pulmonary disease, and was a City of Blackfoot firefighter for over twenty years. Additionally, Dr. Dickson testified that Aikele encountered various burning and smoldering substances during his over twenty years of service. Common sense compels the conclusion that these sites and substances featured smoke, chemical fumes, and/or other toxic gases. Although Dr. Dickson could not produce a list of these substances or their amounts, the statute does not require this data. Aikele was able to demonstrate each fact that the statute requires and, therefore, he met the bar for recovery. His situation is precisely what this statute was written for.

It is obvious to me that the Legislature intended to protect firefighters suffering from certain classes of ailments that elude typical models of causation. To accomplish this, it relaxed the standards applied to other diseases in order to prevent erecting barriers to recovery. Idaho Code section 72-438(12) embraces the fact that the overwhelming majority of lung cancers are attributable to environmental factors, as well as the near impossibility of proving their exact cause. To hold otherwise implants requirements into the provision that it plainly does not contain and writes the possibility of recovery for firefighters in Aikele's situation out of the occupational disease statute entirely. For these reasons, I must respectfully dissent from the opinion of the Court.

Justice W. JONES, CONCURS.

17