## IN THE SUPREME COURT OF THE STATE OF IDAHO
### Docket No. 37166

| | | |
|---|---|---|
| ROBERT A. WATSON, | ) | |
| | ) | |
| Claimant-Appellant, | ) | Boise, August 2010 Term |
| | ) | |
| v. | ) | 2010 Opinion No. 101 |
| | ) | |
| JOSLIN MILLWORK, INC., Employer, | ) | Filed: October 1, 2010 |
| LIBERTY NORTHWEST INSURANCE | ) | |
| CORPORATION, Surety | ) | Stephen W. Kenyon, Clerk |
| | ) | |
| Defendants-Respondents. | ) | |

Appeal from the Industrial Commission.

Industrial Commission decision, affirmed.

Ellsworth, Kallas, Talboy & DeFranco, PLLC., Boise, for appellant.

Law Office of Harmon & Day, Boise, for respondents.

_____

BURDICK, Justice

This case involves an occupational disease claim that came before the Idaho Industrial Commission (Commission) at an Emergency Hearing on December 19, 2008. Appellant Robert A. Watson (Watson) alleged that his Sawyer/Assembler job with Joslin Millwork, Inc. (Joslin) (when referred to jointly, Joslin and Liberty Northwest Insurance Co. are referred to as "Respondents") exposed him to the characteristic and peculiar hazards of repetitive heavy lifting, twisting and bending. Watson contends that his industrial exposure to the hazards of his job caused his non-acute lumbar spine occupational disease. The Commission denied his claim, finding that Watson failed to prove that his need for surgery was the result of an occupational disease arising out of, and in the course of, his employment. We affirm the decision of the Commission.

### I. FACTUAL AND PROCEDURAL BACKGROUND

Watson began his employment with Joslin around September 13, 2005, at the age of 28. Prior to that time, Watson was employed as a drywall hanger for approximately nine years. In

1

November 2007, Watson began to develop pain in his left buttocks that traveled down his left leg to his knee. Watson stated that he was not involved in any type of accident at work or outside of work prior to the onset of his symptoms. On December 12, 2007, he began seeing a chiropractor named Miles Ranck for evaluation and treatment. On the intake form that Watson filled out on his first visit to Dr. Ranck he stated that his injury had been caused by "physical labor." After five or six sessions without improvement, Dr. Ranck referred Watson to a physiatrist, Dr. James Bates.

Watson saw Dr. Bates from January 17, 2008, until March 14, 2008. When Watson's condition did not improve with the use of prescription medication, Dr. Bates ordered an MRI. The MRI was completed on January 23, 2008, and showed a "moderate sized left paracentral disk herniation at L5-S1 with an extruded fragment which may be a free fragment extending down into the left lateral recess dorsal to the S1 vertebral body resulting in severe left lateral recess stenosis and displacement of the traversing left S1 nerve root posteriorly." Dr. Bates eventually referred Watson to a neurosurgeon, Dr. Tyler Frizzell. Watson met with Dr. Frizzell on March 6, 2008, and Dr. Frizzell concluded that Watson needed surgery.

Watson testified that he did not have any major injuries, illnesses, diseases or other problems involving his lower back when he was younger. Watson was injured in a car accident when he was 14 years old, but he did not suffer any injuries to his lower back. Watson further testified that prior to his work with Joslin he was not involved in any industrial injuries or other motor vehicle accidents and that he had absolutely no low-back problems.

Watson stated that he told his supervisor at Joslin, Brian Leisten, that he wanted to get out of the drywall business because his "elbow just couldn't take the pressure anymore." A letter from Leisten dated April 12, 2008, states that Watson had made comments regarding soreness in his elbow, shoulder and back, attributed to installing sheetrock. Watson denies having said this. Leisten also wrote that, near the end of 2007, Watson asked for time off due to soreness in his back and "[i]n the past, on two occasions that [Leisten was] aware of, [Watson] needed to have his back 'popped' by a chiropractor."

Watson stated that, prior to going to work for Joslin he did not visit a chiropractor. However, "shortly after" Watson started working at Joslin he started seeing a chiropractor for treatment for low-back pain. The pain did not include "any symptoms that radiated from [his] low back down into [his] left buttock or left leg to the knee." His first of two visits was on

December 13, 2005. During that visit, an x-ray was taken and the chiropractor told Watson that "there was nothing wrong." In May 2006, Watson was in a motor vehicle accident where he suffered injuries to his upper back, lower neck and shoulder. The emergency room physician determined that Watson was suffering from whiplash. Watson specifically testified that he did not suffer any injury to his lower back in that accident.

Watson described the physical demands of his job as including heavy lifting, twisting and bending. More specifically, Watson described his job as follows:

> I use the forklift on the production floor to pick up a pallet/unit of laminated particle board (approximately 34 sheets) and move it into position near the beam saw. After placing the pallet-unit on the floor with the forklift, I have to physically reach out away from my body with both hands/arms and grab each individual 4 X 8 sheet off of the stacked pallet/unit. Each sheet weighs approximately 150 pounds. After I grab and lift the sheet, I have to twist and turn my body around approximately 180 degrees and then maneuver the sheet onto the saw and place it in the proper cutting position. I then perform cuts to specifications with the saw. After the product has been cut to specification, I will manually pick up each cut sheet and stack the individual cut sheets into a stack on the fall-off table which is attached to the saw. After I stack 4-6 individual cut pieces, I then manually grab the entire stack, lift it, turn and carry it approximately 15-20 feet where I place it on a parts' [sic] cart. The cart has 2 shelves. The upper shelf is approximately 40 inches off of the ground and the lower shelf is approximately 10 inches off of the ground. When I slide the cut pieces into the shelves, I bend and twist at the waist in order to manipulate and position the cut product. In order to place the cut product on the lower shelf, I have to bend all the way down almost to the floor and then bend over at the waist from my body. Most of the time, I have to stretch my leg out and place my right foot behind the wheel on the cart in order to prevent it from moving or slipping away during the shelving process. During a standard 8.0 hour work shift, I will lift, carry, twist, turn, bend at the waist, push and pull these laminate sheets approximately 6 out of every 8 hours of 75% to 80% of the time. As part of the production cycle, I am required to perform these physical movements repeatedly at a very fast pace (i.e., as fast as the saw will cut the product and as fast as I can move my body while lifting and carrying these heavy sheets of laminate).

Watson stated that he performed his work "as fast as the saw lets me. Usually at a moderate to fast pace."

Dr. Frizzell sent a letter to Dr. Bates on March 6, 2008, stating that Watson had "about exhausted conservative measures," and that he had discussed a lumbar microdiscectomy with Watson. On May 5, 2008, Dr. Frizzell sent a letter to Watson's attorney answering "yes" to five questions pertaining to the issue of whether Watson's disease was incurred in or arose out of and

3

in the course of his employment with Joslin and was, in fact, a lumbar spine occupational disease.

Watson's attorney wrote Joslin's workers' compensation insurance company, Liberty Northwest, a letter on May 8, 2008, putting them on notice of Watson's occupational disease claim. In that letter, the attorney asked Liberty Northwest to authorize the L5-S1 microdiskectomy surgery recommended by Dr. Frizzell. Liberty Northwest did not respond. Liberty Northwest also failed to reply to two subsequent requests.

Watson filed his Complaint with the Industrial Commission on June 11, 2008. The complaint alleged that:

> [t]he Claimant contracted/incurred an occupational disease in his low back as the result of performing his job duties for Joslin Millwork, Inc., which consisted of reaching, grabbing, lifting, carrying, twisting, turning, pushing pulling and bending over at a fast pace.

Watson stated that he met with Dr. Michael Weiss in October 2008 and that the Independent Medical Examination (IME) process was "like a physical exam. That's about it. We discussed my past a little bit. The car wreck, etc." Watson said that Dr. Weiss did not ask Watson any questions about his job at Joslin. Respondents first put Watson on notice that they intended to take a post-hearing deposition of Dr. Weiss on December 8, 2008.

The referee issued his Findings of Fact, Conclusions of Law, and Recommendation (Findings of Fact) on June 8, 2009, finding that Watson had not incurred a compensable occupational disease. The referee primarily relied on the following "observations" of Dr. Weiss in making his determination:

> 9.        Dr. Weiss reviewed medical records and a job description, examined Claimant, and took his history. He reached the diagnosis of chronic low back pain with sciatica. He noted that back pain is very common in the population which makes it difficult to ". . . say what's causal in something that everybody has." Dr. Weiss Deposition, p. 17. He further noted that Claimant's January 23, 2008, lumbar MRI revealed advanced degenerative disc disease at L5-S1 and moderate to severe left L4-L5 and mild-moderate bilateral L5-S1 facet joint arthropathy. Dr. Weiss opined that it was not possible to determine when the free fragment occurred, but that Claimant does not have sufficient physical findings to conclude that the free fragment is causing his back pain.

> 10.        Dr. Weiss sees no connection between Claimant's need for back surgery and his employment. He concedes that heavy materials handling is associated with chronic back pain as is strictly sedentary work. Dr. Weiss is troubled that there was no specific event that could

4

be temporally related to the onset of Claimant's back pain. He acknowledged that high impact activity can lead to the progression of underlying arthritis, but does not <u>cause</u> it.

The referee also found that Watson's "underlying degenerative joint disease and arthritis was certainly present in November 2007 and was not caused by his work." He based that finding on the fact that Watson saw a chiropractor for low-back pain on December 13, 2005, and that "prior to the commencement of his employment by Joslin, Claimant had complained to another employer that he hoped to get out of the drywall business because it was causing him low back pain." Finally, the referee stated that "[i]t would be reasonable to conclude that Claimant's heavy/repetitive work activities (with which Defendants do not disagree) may have speeded the progression of his underlying disease, but *Nelson* and its progeny preclude recovery as there is no accident here."

On July 8, 2009, Watson submitted his Motion to Strike the medical opinions of Dr. Weiss. The primary basis for this motion was Watson's contention that Dr. Weiss only expressed four opinions in his October 1, 2008, IME Report and none of those opinions discussed the specific hazards of Watson's job or addressed any of the elements of a prima facie case for a compensable occupational disease claim. Therefore, Watson contends, there was no foundation for the subsequent post-hearing medical opinions offered by Dr. Weiss and Watson was not on notice of the substance and subject matter of those medical opinions. The Commission filed its Order on Reconsideration and Pending Motions on October 14, 2009, correcting two minor mistakes to the Findings of Fact, but otherwise denying Watson's motions.

Watson filed his Notice of Appeal with this Court on November 24, 2009.

## II. STANDARD OF REVIEW

As this Court stated in *Giltner, Inc. v. Idaho Department of Commerce and Labor*:

"On appeal from the Industrial Commission, this Court exercises free review of the Commission's legal conclusions, but will not disturb findings of fact if they are supported by substantial and competent evidence." *Steen v. Denny's Rest.*, 135 Idaho 234, 235, 16 P.3d 910, 911 (2000). "Substantial and competent evidence is relevant evidence that a reasonable mind might accept to support a conclusion." *Uhl v. Ballard Med. Prods.*, 138 Idaho 653, 657, 67 P.3d 1265, 1269 (2003). "The conclusions reached by the Industrial Commission regarding the credibility and weight of evidence will not be disturbed unless the conclusions are clearly erroneous." *Excell Contr., Inc. v. State, Dept. of Labor*, 141 Idaho 688, 692, 116 P.3d 18, 22 (2005) (citing *Hughen v. Highland Ests.*, 137 Idaho 349, 351, 48 P.3d 1238, 1240, (2002)). We will not re-weigh the evidence or

consider whether we would have drawn a different conclusion from the evidence presented. *Id*.

145 Idaho 415, 418, 179 P.3d 1071, 1074 (2008). In fact, this Court may only set aside an order of the Industrial Commission on one of the following four grounds:

> (1) The commission's findings of fact are not based on any substantial competent evidence;
> (2) The commission has acted without jurisdiction or in excess of its powers;
> (3) The findings of fact, order or award were procured by fraud; [or]
> (4) The findings of fact do not as a matter of law support the order or award.

*Stoddard v. Hagadone Corp*., 147 Idaho 186, 190, 207 P.3d 162, 166 (2009) (citing I.C. § 72-732).

### III. ANALYSIS

Watson raises numerous issues on appeal, which we summarize as follows: (1) whether the Commission based its denial of Watson's claim on substantial and competent evidence; (2) whether the Commission erred in denying Watson's Motion to Strike the post-hearing medical opinions of Dr. Weiss; and (3) whether Watson is entitled to attorney fees.

### A. The Industrial Commission based its denial of Watson's claim on substantial and competent evidence.

Watson argues several sub-issues that fall under the primary issue of whether the Commission denied his claim without substantial and competent evidence supporting its decision. Instead of analyzing these claims individually we shall examine the evidence the Commission based its decision upon and determine whether it was substantial and competent. We find that the Commission's denial of Watson's claim was based on substantial and competent evidence.

As was stated in *Neufeld v. Browning Ferris Industries*:

> The determination of whether a particular injury arose out of and in the course of employment is a question of fact for the [C]ommission. Such a determination necessarily involves weighing the evidence and assessing the credibility of the various witnesses, and is therefore committed to the expertise of the [C]ommission. The [C]ommission's conclusions as to the weight and credibility of the evidence will not be disturbed on appeal unless they are clearly erroneous.

109 Idaho 899, 902, 712 P.2d 600, 603 (1985) (internal citations omitted). Furthermore, in *Idaho State Insurance Fund v. Hunnicutt*, we noted that:

> [t]he substantial evidence rule is said to be a middle position which precludes a *de novo* hearing but which nonetheless requires a serious review which goes beyond the mere ascertainment of procedural regularity.

6

> Such a review requires more than a mere scintilla of evidence in support of the agency's determination, though something less than the weight of the evidence. Put simply . . . the substantial [competent] evidence rule requires a court to determine whether the agency's findings of fact are reasonable.

110 Idaho 257, 260, 715 P.2d 927, 930 (1985) (internal quotations and citations omitted; second alteration in the original). "As with industrial accident claims, an occupational disease claimant has the burden of proving, to a reasonable degree of medical probability, a causal connection between the condition for which compensation is claimed and occupational exposure to the substance or conditions which caused the alleged condition." *Langley v. State, Indus. Special Indem. Fund*, 126 Idaho 781, 786, 890 P.2d 732, 737 (1995).

Here, the Commission had two relevant conflicting medical opinions regarding the connection between Watson's medical condition and his occupation. Dr. Frizzell wrote two letters. In his first letter, a response to a letter from Watson's attorney, Dr. Frizzell responded with a succinct "yes" to five questions, indicating that he believed "on a more likely than not medical basis" that Watson's condition was caused by his occupation. In his second letter Dr. Frizzel, having reviewed Dr. Weiss's IME Report, responded to that report, providing a few sentences of detail. Although Dr. Frizzell offered very little explanation as to the bases for his opinions in either of his letters, these opinions still constituted a prima facie case for occupational disease, if the Commission had not been presented with conflicting evidence. In his IME Report, Dr. Weiss stated, with greater elaboration than Dr. Frizzell, that he did not find on a more likely than not medical basis that Watson's condition was caused by his occupation.

Given the deference that this Court shows to the Commission's weighing of conflicting evidence, the only question is whether Dr. Weiss's IME Report, and post-hearing deposition expounding on that IME Report, constitute substantial and competent evidence. We find that they did, and therefore, the Commission acted within its discretion in giving more weight to Dr. Weiss's medical opinion than it gave to Dr. Frizzell's.

Watson notes that expert opinions which merely suggest possibilities only invite conjecture and may be properly excluded. *See Elce v. State*, 110 Idaho 361, 716 P.2d 505 (1986). Watson suggests that Dr. Weiss's IME Report and post-hearing deposition should have been excluded as Dr. Weiss had no foundation for his expert testimony, having admitted that he neither read Watson's job description, nor asked Watson any questions about the tasks that his job entailed. Respondents concede that Dr. Weiss had no knowledge about Watson's job when

he offered his medical opinion, but argue that this fact is irrelevant. Respondents argue that the crux of Dr. Weiss's medical opinion was that "because back pain is so common, it is impossible to establish a causal connection between a person's job and back condition."

Dr. Weiss saw Watson for an independent medical evaluation on October 1, 2008. Based on that evaluation, Dr. Weiss concluded that "[Watson] obviously has chronic low-back pain that's defined by back pain that's more than six months' duration." Dr. Weiss also stated that the "only thing" Watson had that "points to a specific level of a back nerve problem, or disk problem . . . was a positive straight leg raise, which means that he had pain going down his leg, both sitting and laying down, with raising his leg above 30 degrees. And he also had mild calf atrophy. It was like 1 centimeter difference on the left side . . . it has to be greater than 2 centimeters to be considered significant . . . . There was an MRI that was done that showed multilevel degenerative disk disease, and a free disk fragment at L5-S1." Dr. Weiss admitted that he had not reviewed Watson's job description nor asked him any questions about his job during the October 1, 2008, examination. After the job description was read to him at the deposition he responded:

> Well, I think there's two issues there. One is an issue of convention, and one is an issue of causation on a more likely than not basis. And there — and in occupational medicine, we frequently use conventions to — 'cause we recognize — for example, for back pain, we recognize that it's multifactorial. Okay.
>
> Back pain is very common in the population. The incidence of back pain sufficient to limit your activity over the course of a lifetime is estimated between 96 and 98 percent in various populations. So it's ubiquitous. So it becomes hard to say what's causal in something that everybody has. Okay.
>
> We do know that arthritis on MRI and CT and X-ray is also almost ubiquitous, and tends to be most strongly related with age. If you do MRIs of general population, people just walking down the street with no complaints whatsoever, and you look for what we consider to be abnormalities, or things that we associate with back pain, what you find, that about one out of five people under the age of 20 will have those kind of abnormalities, disk herniations, bulges, facet abnormalities, and so on.
>
> When you get to be 40, it's about 50 percent. And when you get to be my age, it's about 85 percent. And so, you know, what causes something has to go back to those principles I was talking about. . . .
>
> Hill Criteria. So if you see it in everybody, it's hard to say that one activity is more likely to cause it than another activity.
>
> The convention that we use is that, if somebody is at work, and they are doing some sort of lifting activity, some sort of physical activity, and they have a sudden onset of back pain, with pain going down their leg, and when you examine them they have sensory loss, reflex changes, straight leg raising perhaps,

8

weakness that correlates to a certain level of the spine, certain nerve root, and you do an MRI on that person and there is a disk herniation that appears to be acute — and a free fragment might be one of those in this case — that that is then accepted as causal.

Even though we recognize that degenerative disk disease, spinal arthritis, drying out of the disk, friability of disks, and so on, is a chronic problem that can be related to heredity, to aging, to multiple factors over a lifetime, diet. Sometimes people smoke, that can affect it. Obesity. All kinds of factors that can be related to that.

We accept that as a convention, that if it's a sudden onset, that it's accepted as causal; that that's the convention, although we recognize it's multifactorial.

In this case, what we have — applying the Hill Criteria is — when we go through records — we find that there's no specific injury. Mr. Watson was very clear about that; that he had onset of back pain around November of 2007 without a specific injury.

He had an MRI done around that time that showed multilevel degenerative disk disease. Well, that's something that takes place over years. So that wasn't something that acutely came on in November of 2007.

There was a free fragment, which could have occurred sometime in November 2007, or sometime before that. It's hard to know. And he doesn't really have a lot of physical findings that support that fragment as being causal of his back pain.

There's some. And like I said, he has the — he had the positive straight leg raising. He has questionable atrophy, and that's it. . . .

I do know that heavy materials handling is associated with chronic back pain, but also strictly sedentary work is associated with chronic back pain.

When Dr. Weiss was asked whether he had any evidence from Joslin regarding whether Watson was not required to "stick his right foot out behind the wheel on this cart and use it as a braking mechanism when he was sliding the fabricated pieces onto the shelves of his cart," he responded:

He was required to do that? I don't — I don't have — well, I didn't refer to the job description of that. But I don't — I don't have — that seems a bit hard to believe that was part of the requirement. But again, it doesn't make any difference, because the issue, again, becomes one of cumulative trauma versus specific trauma.

Dr. Weiss gave examples indicating that, had Watson been doing something at work and "had a sudden onset of back pain going down his leg with appropriate findings, and then had a diagnosis of disk herniation, we would usually accept that as causal . . . ."

We conclude that Dr. Weiss offered an expert medical opinion, as did Dr. Frizzell. The Commission was acting within its discretion in choosing to place more credence in the opinion

9

of Dr. Weiss, and that opinion in conjunction with other evidence considered, constituted substantial and competent evidence supporting its findings.

We note that the Commission's decision in this case does not mean that low-back disk herniation can never constitute an occupational disease absent specific identifiable trauma. *See Flores v. Boise Cascade*, 2007 IIC 0420 at \*21 (2008) (finding an L4-L5 disk herniation to be causally connected with occupation despite lack of specific identifiable trauma). Rather the decision reflects the Commission's determination that the IME Report and subsequent post-hearing deposition by Dr. Weiss were more persuasive than the letters submitted by Dr. Frizzell, which provided very little detail.

**B. The Commission did not err in denying Watson's motion to strike all post-hearing medical opinions expressed by Dr. Weiss.**

As both parties agree, the critical dispute is whether Watson's exposure to the hazards of repetitive lifting, twisting and bending caused Watson's lumbar spine degenerative disc disease. The Commission determined that it did not and, therefore, denied Watson's claim. Watson argues that it was improper for the Commission to consider the medical opinions expressed by Dr. Weiss in his post-hearing deposition, as the Commission should have granted Watson's motion to strike these medical opinions under I.R.C.P. 26(b)(4), I.R.C.P. 26(e) and J.R.P. 10(E)(4). Respondents argue that Watson was given proper pre-hearing disclosure of Dr. Weiss's medical opinions, and that Dr. Weiss's deposition testimony — although longer than his IME Report — did not differ from the IME Report in any meaningful way.

Judicial Rules of Practice and Procedure Under the Idaho Workers' Compensation Law Rule 10(E)(4) states:

> Unless the Commission, for good cause shown, shall otherwise order at or before the hearing, the evidence presented by post-hearing deposition shall be evidence known by or available to the party at the time of the hearing and shall not include evidence developed, manufactured, or discovered following the hearing. Experts testifying post-hearing may base an opinion on exhibits and evidence admitted at hearing but not on evidence developed following hearing, except on a showing of good cause and order of the Commission. . . .

Although Watson claims that the Commission should have granted his motion to strike on one of two grounds, ultimately his claims both presume that new medical opinions were offered by Dr. Weiss at his post-hearing deposition. As we conclude that Dr. Weiss did not offer new medical opinions at his post-hearing deposition, but merely expounded upon those previously offered, Watson's claims necessarily fail.

10

Dr. Weiss's IME Report offers two paragraphs of analysis, and does not directly state an opinion on whether or not Watson's injuries are related to his occupation, but it may easily be inferred that Dr. Weiss did not find it to be more likely than not that Watson's injuries were caused by his occupation. The first paragraph of Dr. Weiss's IME Report analysis merely concludes that it would be within the standard of community practice for Watson to have surgery. The second paragraph reads as follows:

> He [Watson] does have a past history of two motor vehicle accidents, one sufficient to cause permanent hearing loss in the left ear and another sufficient to cause him to seek care in the ER and be taken off work. Why Dr. Frizzell believes these are unrelated to his spinal diagnoses on a more likely than not basis, but his 2 years of work as a cabinet maker is casual is not clear. Back pain and spinal arthritis are common in the general population. Heavy work is also called exercise, and is generally thought to be beneficial. In fact, individuals who do strictly sedentary work also have high rates of back pain complaint and disability. Dr. Frizzel's logic would seem to imply that all heavy activity is hazardous and would seem to preclude not only the 15% of jobs that are heavier than moderate, but most contact sports and much exercise regimens at gymnasia.

These two small paragraphs are the extent of Dr. Weiss's analysis in his IME Report. Dr. Weiss's deposition, on the other hand, comprises nearly 68 pages of transcript.

Dr. Weiss's IME Report conveys that Dr. Weiss's opinion that Watson's lumbar spine degenerative disc disease was not caused by his occupation. Watson was provided with notice that Dr. Weiss questioned Dr. Frizzell's judgment, where Dr. Frizzell concluded that Watson's injury was work related. Dr. Weiss mentions other factors that could have caused the injuries and notes that both back pain and spinal arthritis are common in the general population. Dr. Weiss provides more detail in his post-hearing deposition regarding the possible causal factors for injuries like Watson's, noting that factors such as age, heredity, diet, obesity and use of tobacco cigarettes may increase the chances of a person developing the ailments that Watson has. All-in-all Dr. Weiss's deposition testimony explains in greater detail why he believes it is impossible to determine causation for Watson's injuries, this testimony does not involve evidence developed, manufactured or discovered following the December hearing.

Dr. Weiss did not offer a medical opinion regarding the causation of Watson's injuries in either his IME Report or post-hearing deposition; rather he offered the opinion that it could not be determined, on a more likely than not basis, what had caused Watson's injuries. Watson appears to mistake Dr. Weiss's explanation of the different types of factors that could lead to the type of injuries suffered by Watson, as expressing an opinion that these factors did, in fact, cause

Watson's injuries. As Dr. Weiss's testimony at his post-hearing deposition was consistent with the medical opinion expressed in his IME Report, we affirm the Commission's denial of Watson's motion to strike any of Dr. Weiss's post-hearing deposition testimony.

**C. Watson is not entitled to attorney fees.**

Watson contends that he is entitled to an award of attorney fees pursuant to I.C. § 72-804 and I.A.R. 41 because Respondents denied this claim and refused to pay benefits without reasonable grounds. I.C. § 72-804 authorizes attorney fees to be paid to a claimant, where the employer or surety contests a claim for compensation without reasonable grounds to do so. As this Court affirms the Commission's determination that Watson is not entitled to compensation, attorney fees are denied.

## IV. CONCLUSION

This Court affirms the Commission's decision denying Watson compensation on the basis that Watson had failed to demonstrate that his needed surgery was the result of an occupational disease arising out of, and in the course of, his employment. Costs to the Respondents.

Chief Justice EISMANN and Justices J. JONES, W. JONES and HORTON, **CONCUR.**