# IN THE SUPREME COURT OF THE STATE OF IDAHO
## Docket No. 44552

|  |  |  |
|---|---|---|
| CHARLES LEROY HARTGRAVE, | ) | |
| | ) | |
| Claimant-Appellant, | ) | Boise, January 2018 Term |
| | ) | |
| v. | ) | 2018 Opinion No. 18 |
| | ) | |
| CITY OF TWIN FALLS, Employer, and | ) | Filed: March 5, 2018 |
| STATE INSURANCE FUND, Surety, | ) | |
| | ) | Karel A. Lehrman, Clerk |
| Defendants-Respondents. | ) | |

Appeal from the Industrial Commission.

Appeal from Industrial Commission ruling, <u>affirmed.</u>

L. Clyel Berry, Chartered, Twin Falls, for appellant. L. Clyel Berry argued.

Augustine Law Offices, PLLC, Boise, for respondents. Paul J. Augustine argued.

_____

BURDICK, Chief Justice.

Charles Leroy Hartgrave brings this appeal from the Idaho Industrial Commission (the Commission). Hartgrave sustained injuries to his left knee while working for the City of Twin Falls (the City) on February 3, 2009, and August 23, 2012. Although Hartgrave's left knee injuries and corresponding treatments were covered by Idaho's Workers Compensation Act, Hartgrave contends the left knee injuries aggravated preexisting degenerative joint disease in his right knee and ultimately required a total knee arthroplasty (TKA) in his right knee. The Commission rejected Hartgrave's position and ruled that Hartgrave's right TKA was not compensable. Hartgrave timely appeals that ruling and we affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Hartgrave has worked for the City's Street Department since 1978. While working on February 3, 2009, Hartgrave injured his left knee. As Hartgrave explained the injury,

[he] was doing a pavement survey with a couple of other guys. [He] was outside of the truck. [He] was running a measuring wheel down the road, and [he] stepped on a piece of uneven blacktop there. [He] didn't see it, and [he] stepped on it. As soon as [he] did, [he] felt his knee pop.

Hartgrave initially "didn't think too much about it[,]" but as the day progressed, "it got much worse." As a result, Hartgrave visited Dr. Douglas Stagg, M.D., on February 17, 2009. Dr. Stagg noted that Hartgrave "ambulate[d] favoring the left knee enough that it affect[ed] his gait with a slight limp[,]" cleared Hartgrave for normal work, and prescribed a brace, "lot[s] of ice," and "Motrin 600 mg t.i.d." Due to persistent pain in his left knee, Hartgrave visited Dr. Stagg twice more before he was referred to Dr. Tyler McKee, D.O., for an orthopedic evaluation.

Dr. McKee performed that evaluation on March 13, 2009, diagnosed a meniscal tear in Hartgrave's left knee, and recommended an "arthroscopy of the left knee with partial lateral meniscectomy." Although that visit arose from the injury to Hartgrave's left knee, Dr. McKee evaluated Hartgrave's right knee and noted no tenderness or instability and full strength and range of movement in the right knee. However, after reviewing bilateral x-rays, Dr. McKee discovered that Hartgrave suffered from "pretty severe" osteoarthritis in his right knee, and, in fact, Hartgrave was actually "bone on bone" in his right knee at that time. As such, during the March 13, 2009, visit, Dr. McKee inquired whether Hartgrave was interested in a right TKA at that time, but Hartgrave responded that he had no pain in his right knee and did not want to pursue the procedure. Regarding his left knee, Hartgrave obtained worker's compensation approval from the Idaho State Insurance Fund (ISIF) and underwent Dr. McKee's recommended left knee surgery on May 6, 2009. He returned to work sometime during June or July 2009.

Hartgrave, however, continued suffering from persistent pain in his left knee and hip. He visited Dr. James Retmier, M.D., on August 30, 2010, for a second opinion of his left knee. Dr. Retmier surmised that Hartgrave had "failed all forms of conservative care and is a candidate for [(a left TKA)]" and, accordingly, further noted that "we will ask [worker's compensation] for authorization and then plan on proceeding."

In response to Dr. Retmier's evaluation, ISIF enlisted Dr. Brian Tallerico, D.O., to perform an independent medical examination (IME), which occurred on December 16, 2010. After evaluating Hartgrave's left knee, Dr. Tallerico concluded "[t]here is absolutely no need for a [(left TKA)] in this individual, and it certainly is not related to the industrial injury of February 3, 2009." Although that visit arose from the injury to Hartgrave's left knee, Dr. Tallerico noted

that Hartgrave expressed having "problems with the right knee in the past (open meniscectomy in 1971 with ongoing swelling and symptoms)[.]" Dr. Tallerico further noted that, "[i]nterestingly enough, [Hartgrave's] right knee is in much worse shape than his left knee with significant lateral compartment collapse and loss of cartilage interval." Dr. Tallerico ultimately concluded that the "[p]reexisting history of bilateral knee degenerative joint disease [was] unrelated to the [February 3, 2009, accident] on a more-probable-than-not basis and not aggravated by it." Thereafter, ISIF denied Dr. Retmier's recommendation for a left TKA, and Hartgrave returned to work.

While working on August 23, 2012, Hartgrave sustained another injury to his left knee. As Hartgrave explained, "[he] was running a water truck. [He] went to get out of the truck. [He] was holding onto a bar here, and [his] foot slipped off the bottom step of the truck. When [he] hit the ground, [he] twisted around; and it hurt the [left] knee." Hartgrave visited Dr. McKee for treatment. Dr. McKee conducted x-rays that revealed "degenerative joint disease of the lateral compartment of both knees. It is worse on the right than the left." Dr. McKee ultimately recommended a left TKA. After obtaining worker's compensation approval, Hartgrave underwent the procedure on March 13, 2013.

Hartgrave spent approximately six weeks on crutches after the left TKA. He attended several follow-up visits with Dr. McKee, but he never complained of pain in his right knee and instead only complained of pain in his left knee and hip. On August 9, 2013, Dr. McKee concluded Hartgrave had reached maximum medical improvement and authorized him to return to work with restrictions of no squatting, kneeling, or lifting weight in excess of fifty pounds.

On November 8, 2013, Hartgrave visited Dr. McKee and reported pain in his right knee. Dr. McKee diagnosed "[s]evere degenerative joint disease of the right knee with a lesser degree on the left." Even though Hartgrave had never before complained of right knee pain to Dr. McKee, and even though Dr. McKee had never noticed Hartgrave limping with regard to the right leg, Dr. McKee and Hartgrave discussed treatment options and decided to proceed with a right TKA. That procedure was performed on November 25, 2013. Hartgrave initially did not seek worker's compensation approval for the right TKA and instead billed his health insurer. Hartgrave later testified he did not know why he did not seek worker's compensation approval for the right TKA.

3

Thereafter, on January 23, 2014, Hartgrave filed two worker's compensation complaints. In the first, Hartgrave cited the February 3, 2009, accident and sought relief of permanent partial impairment, disability benefits, medical benefits for the "injury to right knee, culminating in right TKA," and attorney fees. In the second, Hartgrave cited the August 23, 2012, accident and sought relief identical to that requested in his first complaint. The City and ISIF (collectively, Respondents) answered both complaints and denied liability, and the Commission consolidated both cases.

The parties eventually entered into a settlement agreement that resolved most issues, but the settlement agreement expressly left unresolved whether Hartgrave's right TKA is compensable. When that issue was submitted to the Commission, the Referee's recommendation reasoned that an "accident" did not aggravate the preexisting degenerative joint disease in Hartgrave's right knee and concluded that Hartgrave's right TKA is not compensable. The Commission agreed with the Referee's ultimate conclusion that Hartgrave's right TKA is not compensable, but employed different reasoning. As the Commission reasoned, Hartgrave's right TKA "was necessitated by the natural progression of his arthritis and unrelated to the industrial injuries." Hartgrave timely appeals that ruling.[1]

## II. ISSUES ON APPEAL

1. Is the Commission's ruling that Hartgrave's right TKA is not compensable based on substantial, competent evidence?

2. Should attorney fees be awarded on appeal?

## III. STANDARD OF REVIEW

In an appeal from the Commission,

this Court reviews "whether the Commission's findings of fact are supported by substantial and competent evidence," but freely reviews its legal conclusions. *Shubert v. Macy's W., Inc.*, 158 Idaho 92, 98, 343 P.3d 1099, 1105 (2015), *abrogated on other grounds by Chavez v. Stokes*, 158 Idaho 793, 353 P.3d 414 (2015). "Substantial and competent evidence is relevant evidence which a

---

[1] As an aside, we observe a few procedural aspects unique to this case. This matter was submitted to the Commission on a stipulated record in lieu of a hearing. The Commission entered its initial order on August 30, 2016. Hartgrave filed a timely notice of appeal, but it later became clear that the Commission had failed to consider all of the stipulated exhibits. Thus, this Court stayed the appeal and issued a temporary remand to the Commission with instructions to review the omitted exhibits and take whatever action appropriate. Hartgrave moved the Commission to reopen the record under Idaho Code section 72-719(3) to correct manifest injustice, contending new evidence would show that he will likely need yet another right TKA. The Commission denied that motion, ruling that it would review the complete record, including the omitted exhibits, and issue a new decision, but not accept new evidence, conduct a hearing, or allow additional briefing. Hartgrave has not appealed the Commission's denial of this motion, but confines his appeal to the Commission's ruling as to his right TKA.

4

reasonable mind might accept to support a conclusion." *Id.* "We will not disturb the Commission's findings on the weight and credibility of the evidence unless those conclusions are clearly erroneous," *id.* nor will this Court "re-weigh the evidence or consider whether we would have drawn a different conclusion from the evidence presented." *Watson v. Joslin Millwork, Inc.*, 149 Idaho 850, 854, 243 P.3d 666, 670 (2010). All facts and inferences are viewed in the "light most favorable to the party who prevailed before the Commission." *Hamilton v. Alpha Servs.*, 158 Idaho 683, 688, 351 P.3d 611, 616 (2015). However, workers' compensation laws are liberally construed "in favor of the employee, in order to serve the humane purpose" behind the law. *Id.*

*Estate of Aikele v. City of Blackfoot*, 160 Idaho 903, 908, 382 P.3d 352, 357 (2016).

## IV. ANALYSIS

**A.    The Commission's ruling that Hartgrave's right TKA is not compensable is supported by substantial, competent evidence.**

Hartgrave's appeal challenges the Commission's ruling that he failed to prove his right TKA is compensable, which rests on causation.[2] Hartgrave, as claimant, carried the burden of proving causation. *Serrano v. Four Seasons Framing*, 157 Idaho 309, 317, 336 P.3d 242, 250 (2014) (quoting *Duncan v. Navajo Trucking*, 134 Idaho 202, 203, 998 P.2d 1115, 1116 (2000)). "The proof required is 'a reasonable degree of medical probability' that the claimant's 'injury was caused by an industrial accident.' " *Id.* (quoting *Anderson v. Harper's Inc.*, 143 Idaho 193, 196, 141 P.3d 1062, 1065 (2006)). Put another way, the "claimant has the burden of proving a probable, not merely a possible, causal connection between the employment and the injury or disease." *Stevens-McAtee v. Potlatch Corp.*, 145 Idaho 325, 332, 179 P.3d 288, 295 (2008) (quoting *Beardsley v. Idaho Forest Indus.*, 127 Idaho 404, 406, 901 P.2d 511, 513 (1995)). "In this regard, 'probable' is defined as 'having more evidence for than against.' " *Aikele*, 160 Idaho at 911, 382 P.3d at 360 (quoting *Jensen v. City of Pocatello*, 135 Idaho 406, 412, 18 P.3d 211, 217 (2000)). "The Commission may not decide causation without opinion evidence from a

---

[2] In his opening brief, Hartgrave recites the following as issues presented on appeal:

> Whether [the Commission's] Findings of Fact, Conclusion of Law, and Order dated/filed June 23, 2017, [1] was erroneous as a matter of law; [2] [was] supported by substantial and competent evidence of record; [3] set forth specific findings necessary and required for meaningful appellate review; and/or, [4] . . . failed to make proper application of law to the evidence of record, in reaching the same?

Nonetheless, Hartgrave offers argument and authority on only the second basis—that is, whether the Commission's order is supported by substantial, competent evidence. *Cf. Liponis v. Bach*, 149 Idaho 372, 374, 234 P.3d 696, 698 (2010) (explaining that argument is waived if "not supported by any cogent argument or authority" in the opening brief). We proceed accordingly.

medical expert." *Serrano*, 157 Idaho at 317, 336 P.3d at 250 (quoting *Anderson*, 143 Idaho at 196, 141 P.3d at 1065).

Hartgrave does not contend his right knee was previously uninjured until the accidents occurring on February 3, 2009, and August 23, 2012, but rather acknowledges that degenerative joint disease in his right knee predated both accidents. Hartgrave broke his right leg when he was in the first grade and injured his right knee during high school. As a result, in 1971, Hartgrave underwent an open meniscectomy. After that surgery, his right knee was "in pretty good shape," but Hartgrave "would have to take an aspirin once in a while." However, Hartgrave argues either the February 3, 2009, or the August 23, 2012, accident, or both, aggravated the preexisting condition in his right knee.

We have previously recognized that, consistent with the humane principles underlying Idaho's Worker's Compensation Act, "an employer takes an employee as he finds him." *Wynn v. J.R. Simplot Co.*, 105 Idaho 102, 104, 666 P.2d 629, 631 (1983). That is to say, "our compensation law does not limit awards to workmen who, prior to injury, were in sound condition and perfect health." *Id.* Rather, "this Court has long held that an employee may be compensated for the aggravation or acceleration of his or her preexisting condition" so long as the "aggravation or acceleration" results from an "accident."[3] *Nelson v. Ponsness-Warren Idgas Enters.*, 126 Idaho 129, 132, 879 P.2d 592, 595 (1994) (citing *Wynn*, 105 Idaho at 105, 666 P.2d at 631; *Woodbury v. Arata Fruit Co.*, 64 Idaho 227, 239, 130 P.2d 870, 875 (1942)); *accord Henry v. Dep't of Corr.*, 154 Idaho 143, 145, 295 P.3d 528, 530 (2013). In fact, this Court has recognized that, in addition to the immediate injury sustained in an accident, a new and distinct injury that later emerges may be compensable if its cause can be traced to the "accident." *See, e.g.*, *Anderson*, 143 Idaho at 195–97, 141 P.3d at 1064–66 (concluding tremors in claimant's hands and arms that emerged after accident in which claimant sustained a neck injury could be traced to the accident and were compensable); *Duncan*, 134 Idaho at 203–04, 998 P.2d at 1116–17 (concluding claimant's back injury that emerged after accident in which claimant sustained a knee injury could be traced to the accident and was compensable).

---

[3] " 'Accident' means an unexpected, undesigned, and unlooked for mishap, or untoward event, connected with the industry in which it occurs, and which can be reasonably located as to time when and place where it occurred, causing an injury." I.C. § 72-102(18)(b). The parties do not dispute that Hartgrave suffered an "accident" under section 72-102(18)(b). While the Referee concluded Hartgrave had not suffered an "accident" under section 72-102(18)(b), the Commission rejected that conclusion. No argument is made on the issue now. We therefore proceed on the assumption Hartgrave suffered an "accident" under section 72-102(18)(b).

In light of these principles, the Commission summarized Hartgrave's position as that Hartgrave's "preexisting right knee condition was aggravated by the industrial accident by this path: [Hartgrave] suffered a left knee injury which required surgery. During his convalescence, [Hartgrave] was required to use crutches and this use of crutches caused a gait alteration which aggravated his right knee condition."[4] The Commission ultimately concluded the evidence did not support Hartgrave's argument. Because the Commission is the finder of fact, this Court will not disturb the Commission's determinations on the weight and credibility of evidence unless these determinations are clearly erroneous. *E.g.*, *Aikele*, 160 Idaho at 908, 382 P.3d at 357.

The Commission, presented with the opinions of Hartgrave's and Respondents' medical experts, gave greater weight to Respondents' medical expert, Dr. Tallerico. Dr. Tallerico opined that neither the February 3, 2009, nor the August 23, 2012, accident aggravated the preexisting degenerative joint disease in Hartgrave's right knee. Dr. Tallerico conducted four IMEs of Hartgrave, the first of which occurred on December 16, 2010. In that IME, Dr. Tallerico noted that Hartgrave expressed having "problems with the right knee in the past (open meniscectomy in 1971 with ongoing swelling and symptoms)[.]" Dr. Tallerico's report states that, "[i]nterestingly enough, [Hartgrave's] right knee is in much worse shape than his left knee with significant lateral compartment collapse and loss of cartilage interval. Both patellofemoral joints are involved in a Merchant's view showing significant osteoarthritic changes. The medial compartments appear grossly spared." Dr. Tallerico concluded that the "[p]reexisting history of bilateral knee degenerative joint disease [was] unrelated to the [2009 accident] on a more-probable-than-not basis and not aggravated by it."

Dr. Tallerico performed three other IMEs. In the second IME, Dr. Tallerico again wrote that the "[p]re-existing history of bilateral knee degenerative joint disease . . . [was] unrelated to the [2009 accident] on a more-probable-than-not basis and not aggravated by it." In the third IME, Dr. Tallerico did not articulate a similar conclusion, but noted "a trace amount of swelling" in the right knee.[5] In the fourth IME, Dr. Tallerico again noted that the "[p]reexisting history of right knee degenerative joint disease . . . [was] unrelated to this industrial claim."

---

[4] The Commission concluded that Hartgrave would be entitled to compensation if he proved this path. We express no view as to that conclusion.

[5] In the third IME, Dr. Tallerico noted that the

> [p]reexisting history of bilateral knee degenerative joint disease [was] unrelated to the industrial injury, and this time temporarily aggravated by the industrial injury on a more probable-than-not basis. It is my opinion that when he fell out of his truck approximately two feet and landed directly

Dr. Tallerico thus testified as follows:

> Q. Essentially, the argument is that the increase in [Hartgrave's] right knee symptoms was caused by the problems he had with his left knee which led him to have his right total knee arthroplasty, meaning that those industrial injuries and the sequela of those industrial injuries accelerated the need for the total knee arthroplasty.
>
> What is your opinion about that?
>
> A. Again, it is my opinion that either injury or surgery to the left knee did not hasten or accelerate the need for a right total knee arthroplasty. [Hartgrave] was destined to have a total knee arthroplasty on the right at some point in time.

Hartgrave takes issue with the weight given to Dr. Tallerico's opinions. Hartgrave notes that Dr. McKee was his primary physician, whereas Dr. Tallerico was specially enlisted by Respondents and performed only four IMEs. However, "[t]he Commission is not bound to accept the opinion of the treating physician over that of a physician who merely examined the claimant for the pending litigation." *Lorca-Merono v. Yokes Wash. Foods, Inc.*, 137 Idaho 446, 451, 50 P.3d 461, 466 (2002); *Gooby v. Lake Shore Mgmt. Co.*, 136 Idaho 79, 86, 29 P.3d 390, 397 (2001). Hartgrave further notes that Dr. Tallerico's IMEs were specifically directed at Hartgrave's left knee, not his right. The Commission acknowledged this point, reasoning "Dr. Tallerico reiterated that the purpose of his various visits with [Hartgrave] focused on his left knee problems; not his right knee, although he would examine his right knee to some extent on each of those visits." Dr. Tallerico similarly testified that "because it is an orthopaedic evaluation, I believe that every time I saw him I did examine the right knee in conjunction with the left knee." He further testified that, "if it's a lower extremity exam, like Mr. Hartgrave's, I will have him put a pair of shorts on so I can look at both knees and perform my physical evaluation." Dr. Tallerico never opined that he was unable to render an opinion on Hartgrave's right knee due to an inadequate basis for the opinion. Nor did he express needing more information to render an accurate or a complete opinion. Thus, the Commission was free to ascribe greater weight to Dr. Tallerico's opinions, despite that Dr. McKee was Hartgrave's primary physician. *See, e.g.*, *Lorca-Merono*, 137 Idaho at 451, 50 P.3d at 466; *Gooby*, 136 Idaho at 86, 29 P.3d at 397.

---

on the left leg, he had an impact injury to his femoral condyle [that] necessitated the microfracture chroplasty. This would at least aggravate his underlying degenerative changes in the knee. This is an entirely different type of mechanism than [was] related to his last claim.

The statement that "this time [the degenerative joint disease was] temporarily aggravated by the industrial injury on a more probable-than-not basis," concerns Hartgrave's left knee, as clarified in Dr. Tallerico's deposition.

8

In deciding to place greater weight on Dr. Tallerico's opinions, the Commission observed that Dr. McKee had rendered inconsistent opinions. In one opinion, rendered on July 29, 2014, Dr. McKee responded to an inquiry from Hartgrave's counsel as follows:

> You ask whether it is my opinion that Mr[.] Hartgrave's right total knee arthroplasty was accelerated or advanced in time by reason of the either direct or indirect consequence of his industrial left knee injuries of 2009 and/or 2012? Mr[.] Hartgrave had severe arthritis in his right knee that was noted on his initial visit in 2009. He would . . . have required a total knee arthroplasty regardless of his industrial injuries.

Thereafter, on August 28, 2015, Dr. McKee responded to an inquiry from Hartgrave's counsel as follows:

> I recall meeting Mr. Hartgrave in 2009 and commenting on his severe right-sided arthritis and that he told me at that point that he did not have pain and did not want to proceed with total knee arthroplasty at that time, because of that reason. I do not recall addressing his right knee pain at all, until late 2013. At that point his knee was significantly more painful and he elected to proceed with right total knee arthroplasty. What I am trying to say is that I feel his industrial injuries caused an aggravation to his right knee pain. Had there not been worsening symptoms we would not have proceeded with total knee arthroplasty. Therefore, yes, I believe that his industrial injuries moved up his need for total knee arthroplasty on the right.

The Commission found it problematic that "Dr. McKee initially opined in July 2014 that Claimant would need a total knee replacement in the right knee regardless of his left knee injuries."

Hartgrave counters that Dr. McKee's opinions are not in fact inconsistent. Hartgrave explains that "the July 29, 2014, report did not respond to the issue whereas the August 28, 2015, report provided specific response to the specific inquiry." Hartgrave's assertion is unpersuasive. The question to which Dr. McKee responded on July 29, 2014, directly inquired:

> Whether it is your opinion that Mr. Hartgrave's right TKA was accelerated or advanced in time by reason of the either direct or indirect consequence of his industrial left knee injuries of 2009 and/or 2012? Put another way, would you have anticipated that Mr. Hartgrave's right TKA would have been required at the point in time it was performed had the 2009 and 2012 industrial left knee injuries not have occurred?

As stated, Dr. McKee responded:

> You ask whether it is my opinion that Mr[.] Hartgrave's right total knee arthroplasty was accelerated or advanced in time by reason of the either direct or indirect consequence of his industrial left knee injuries of 2009 and/or 2012? Mr[.] Hartgrave had severe arthritis in his right knee that was noted on his initial

visit in 2009. He would . . . have required a total knee arthroplasty regardless of his industrial injuries.

That Dr. McKee's response is now unsatisfactory to Hartgrave does not mean that his response was also incomplete, as Hartgrave now contends.

In fact, on August 11, 2014, Hartgrave's counsel responded to Dr. McKee:

You interpreted that July 1 correspondence as merely requesting your opinion whether Mr. Hartgrave's right TKA was accelerated or advanced in time as a consequence of his industrial left knee injuries of 2009 and/or 2012. Thank you for your courtesy in that regard. However, I am concerned that the length of my July 1 correspondence may have confused you. For that, I apologize. That correspondence also made three specific inquiries regarding Mr. Hartgrave's industrial left knee presentment within three numbered paragraphs upon page 3. For your ease of reference, I am enclosing a copy of page 3 from that July 1, 2014, correspondence to you. Hopefully you will respond to those three inquiries.

Notably, Hartgrave's counsel did not object to Dr. McKee's July 29, 2014, opinion regarding Hartgrave's right TKA, but rather thanked Dr. McKee for his opinion in that regard and requested that Dr. McKee respond to certain inquiries concerning Hartgrave's *left* knee. When Dr. McKee responded on September 23, 2014, he did not change or supplement his July 29, 2014, opinion as it concerned Hartgrave's right knee. Nevertheless, on August 28, 2015, Dr. McKee opined "[w]hat I am trying to say is that I feel his industrial injuries caused an aggravation to his right knee pain. . . . I believe that his industrial injuries moved up his need for total knee arthroplasty on the right."

In evaluating Dr. McKee's opinions, the Commission further noted that Dr. McKee's August 28, 2015, opinion was not supported by medical records. As the Commission reasoned, "this is not a case where the treating physician reviewed further medical records and then changed his opinion." Instead, Dr. McKee changed his opinion after reviewing Hartgrave's deposition. Hartgrave does not argue the Commission was factually mistaken in this respect, but rather concedes that Dr. McKee rendered his August 28, 2015, opinion after reviewing Hartgrave's deposition testimony, not further medical records.

Hartgrave speculates that the absence of medical records does not necessarily mean pain in his right knee was never discussed, arguing "[i]t is well known that medical records are not infallible." Hartgrave's call for conjecture is stymied by Drs. McKee's and Tallerico's testimonies. Dr. McKee agreed in his deposition that, if Hartgrave had complained of pain in his right knee, "it would be documented[,]" as it would have been his obligation to do so. Likewise,

10

Dr. Tallerico agreed in his deposition that "there would be some documentation in the medical record about right knee pain . . . ."

The absence of supporting medical records notwithstanding, Hartgrave contends his deposition testimony was uncontradicted and was erroneously disregarded. Hartgrave is correct that "[t]his Court has repeatedly held that the uncontradicted testimony of a credible witness should not be disregarded." *Gerdon v. Con Paulos, Inc.*, 160 Idaho 335, 343, 372 P.3d 390, 398 (2016) (citing *Pierstorff v. Gray's Auto Shop*, 58 Idaho 438, 447–48, 74 P.2d 171, 175 (1937)). However, the Commission did not disregard Hartgrave's deposition testimony. The Commission instead considered Hartgrave's deposition testimony and ascribed greater weight to Dr. Tallerico's opinions. The Commission was not required to accept Hartgrave's testimony as conclusive of causation, given that "[t]he Commission may not decide causation without opinion evidence from a medical expert." *Serrano*, 157 Idaho at 317, 336 P.3d at 250 (quoting *Anderson*, 143 Idaho at 196, 141 P.3d at 1065). Further, the Commission's decision to place greater weight on Dr. Tallerico's opinions is not clearly erroneous because Hartgrave's deposition testimony is internally inconsistent. For example, Hartgrave testified that he discussed the cause of his right TKA with Dr. McKee, stating that such discussion attributed the need for the right TKA to "[b]eing on crutches for six weeks, totally on the right knee, it just caused all sorts of problems." Apparently contradicting himself, Hartgrave later testified that he "d[id]n't remember" whether Dr. McKee ever said that the right TKA "was related to either of [Hartgrave's] left knee injuries[.]"

At any rate, in his deposition, Hartgrave testified that he started suffering from pain in his right knee after the left TKA in March 2013. Eventually, "[i]t just was at the point where [Hartgrave] couldn't get around anymore." Hartgrave had no plans of "having anything done with the right knee" before the left TKA in March 2013. Despite attributing pain in his right knee to the six-week period spent on crutches after the March 2013 left TKA, Hartgrave did not discuss pain in his right knee during that period, but instead waited until November 8, 2013. For that reason, until November 8, 2013, the medical records contain no self-reporting by Hartgrave of pain in his right knee.

Dr. Tallerico did not review Hartgrave's deposition testimony, but he was informed of the material parts of the testimony. Dr. Tallerico refused to "get painted into a corner saying that [Hartgrave] is not telling the truth[,]" but he found Hartgrave's testimony problematic. Dr.

11

Tallerico testified that "the bottom line is that I think being, you know, non-weight bearing or on crutches after that [March 2013 left TKA] is not going to cause the need or accelerate the need for the [right TKA]." Dr. Tallerico testified that he would have expected pain reports during the six weeks spent on crutches. He further testified that Hartgrave "surprisingly" made no mention of his right TKA during the third IME on November 21, 2013, even though the right TKA was performed just four days later.

Dr. McKee opined to the contrary. After reviewing Hartgrave's deposition testimony, Dr. McKee testified as to the time Hartgrave spent on crutches, opining that "I think it could aggravate an already damaged joint, yes." The joint was already damaged, as Hartgrave was "bone on bone" in 2009; yet, he declined a right TKA at that time because he had no right knee pain. Although Dr. McKee testified that time spent on crutches "could" aggravate Hartgrave's right knee, he agreed also that "general daily living" could aggravate Hartgrave's right knee, and that eventually "something [wa]s going to set it off." For example, Dr. McKee agreed that "getting in and out of bed . . . could aggravate [Hartgrave's] right knee," but was unaware whether that happened. He contradicted himself, however, by testifying that he could think of no other cause for Hartgrave's right knee pain aside from the "altered gait following the 2013 [left TKA.]" Even so, like Dr. Tallerico, he further agreed that he would have expected Hartgrave to have made reports of pain during the six weeks spent on crutches, though no pain was reported during that window. Dr. McKee finally agreed that as of August 9, 2013, he had no concerns about the condition of Hartgrave's right knee even though the six-week window Hartgrave spent on crutches had already come and passed. Nonetheless, he testified that, "I believe the need for a [right TKA] occurred earlier because of aggravation from being on crutches."

Again, the Commission determined that Dr. Tallerico's opinions were entitled to the prevailing weight, which is not clearly erroneous. The evidence is in accord that Hartgrave was destined for a right TKA at some point, and his right knee was "bone on bone" in 2009, though he refused a right TKA at that time because he was not experiencing pain. The evidence is in further accord that, from 2009 until the emergence of right knee pain on November 8, 2013, Hartgrave was engaged in any number of "general daily living" activities that could have triggered pain. While the evidence is conflicting as to the precise cause of the pain warranting the right TKA, Hartgrave has not shown the Commission's decision to ascribe greater weight to the opinions of Dr. Tallerico, which are consistent with the medical records, is clearly erroneous.

Distilling Hartgrave's arguments ultimately reveals a request for this Court to employ a *de novo* standard of review. Yet, that is not the proper standard of review at this juncture. *E.g.*, *Serrano*, 157 Idaho at 317, 336 P.3d at 250 ("[T]his Court does not 'conduct a *de novo* review of the evidence or consider whether it would have reached a different conclusion from the evidence presented.' " (quoting *Henderson v. McCain Foods, Inc.*, 142 Idaho 559, 565, 130 P.3d 1097, 1103 (2006)). We affirm the Commission's ruling that Hartgrave's right TKA is not compensable.

## B.     We decline to award attorney fees on appeal.

Hartgrave and Respondents seek attorney fees on appeal. Hartgrave's request arises under Idaho Code section 72-804, which permits "attorney fees on appeal where the employer or its surety unreasonably brought or contested a claim." *Rish v. Home Depot, Inc.*, 161 Idaho 702, 707, 390 P.3d 428, 433 (2017) (quoting *Morris v. Hap Taylor & Sons, Inc.*, 154 Idaho 633, 640, 301 P.3d 639, 646 (2013)). However, based on the above, Respondents have not unreasonably contested Hartgrave's claim. Hartgrave is thus not entitled to an award of attorney fees.

Respondents request as a sanction an award of attorney fees against Hartgrave's counsel and cite to Idaho Appellate Rule 11.2(a), which provides in pertinent part:

> The signature of an attorney or party constitutes a certificate that the attorney or party has read the notice of appeal, petition, motion, brief or other document; that to the best of the signer's knowledge, information, and belief after reasonable inquiry [(a)] it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law, and [(b)] that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation. If the notice of appeal, petition, motion, brief, or other document is signed in violation of this rule, the court, upon motion or upon its own initiative, shall impose upon the person who signed it, a represented party, or both, an appropriate sanction, which may include an order to pay to the other party or parties the amount of the reasonable expenses incurred because of the filing of the notice of appeal, petition, motion, brief or other document including a reasonable attorney's fee.

"We construe [Idaho Appellate Rule] 11.2 in the same manner as [Idaho Rule of Civil Procedure] 11(a)(1) because they have identical wording. [A]ttorney fees can be awarded as sanctions when a party or attorney violates either (a) the frivolous filings clause or (b) the improper purpose clause." *Andrews v. State Indus. Special Indem. Fund*, 162 Idaho 156, ___, 395 P.3d 375, 379 (2017) (quoting *Akers v. Mortensen*, 160 Idaho 286, 289, 371 P.3d 340, 343 (2016)).

13

Here, however, Hartgrave's counsel has not violated Rule 11.2(a). Hartgrave's position, though rejected, is not wholly unsupported, as the evidence is conflicting. Moreover, Hartgrave's counsel did not pursue Hartgrave's claim for an improper purpose. Respondents contend Hartgrave's counsel is the only person who stands to benefit from this appeal by recovering attorney fees, but that argument is in error. While Respondents are correct that Hartgrave's primary health insurer covered the right TKA and that the settlement agreement covered Hartgrave's out-of-pocket costs, nothing suggests it was improper for Hartgrave's counsel to pursue a subrogation claim. In fact, the parties' settlement agreement authorized the subrogation claim, stating that:

> [T]he parties dispute whether both past and future treatment related to [Hartgrave's] right knee, including the TKA of November 2013, is causally related to the . . . injuries of February 3, 2009 and/or August 23, 2012. As discussed below, with respect to any such treatment received to date, the parties have agreed to submit this issue to the Commission for determination. To the extent the Commission determines that [Hartgrave's] right knee condition is related to one or both of these injuries, the claim shall remain open for any future medical benefits related to that condition which are otherwise compensable . . . ."

As contemplated by the settlement agreement, Hartgrave's counsel pursued Hartgrave's claims before the Commission. Hartgrave then requested that his counsel file this appeal.

Respondents further contend sanctions are proper because "during the suspension and temporary remand of the appeal to the Commission, [Hartgrave] requested that the Commission reopen the claim and take additional evidence. This is despite the fact [Hartgrave's counsel] previously agreed to have this case be decided on a stipulated record." Even so, Hartgrave's counsel's conduct does not warrant sanctions. When this Court stayed Hartgrave's appeal on January 19, 2017, it remanded the case to the Commission "to review the allegedly omitted exhibits and *for whatever action appropriate* including issuing a new order which is appealable to this Court." (emphasis added). Hartgrave's counsel then moved to submit additional evidence that would purportedly show Hartgrave's right TKA had " 'failed,' such that it was probable that [Hartgrave] would require a repeat procedure, which would be significantly more complicated and expensive[.]" The settlement agreement clearly permitted the parties to litigate whether "past *and future* treatment related to [Hartgrave's] right knee . . . is causally related to [the accidents]." (emphasis added).

Accordingly, Respondents are not entitled to an award of attorney fees as a sanction against Hartgrave's counsel.

14

We affirm the Commission's ruling Hartgrave's right TKA is not compensable. Costs on appeal, but not attorney fees, are awarded to Respondents.

Justices BEVAN, and Justices Pro Tem SCHROEDER and HUSKEY CONCUR.

MEDEMA, J. Pro Tem, specially concurring.

I fully concur in the majority opinion. I write simply because I am concerned that some language in the opinion may be read more broadly than intended.

The majority states: "[i]n fact, this Court has recognized that, in addition to the immediate injury sustained in an accident, a new and distinct injury that later emerges may be compensable if its cause can be traced to the 'accident.'" The majority cites to *Anderson v. Harper's Inc.* and *Duncan v. Navajo Trucking* as examples of cases where such has occurred. I agree with the majority that the sentence aptly describes the result in both of those cases. I am simply concerned that the language—"a new and distinct injury that later emerges may be compensable if its cause can be traced to the 'accident' "—not be misinterpreted. Hopefully, the facts in *Duncan* will illustrate my concern.

Mr. Duncan was involved in an accident at his work. It was immediately apparent to him that he injured his right knee in that accident and he quickly sought treatment for that injury. *See Duncan*, 134 Idaho at 203, 998 P.2d at 1116. It was not immediately apparent to him that he hurt his back. Over the course of the next month and a half, Mr. Duncan experienced pain in his hip and leg that was evident to his girlfriend, but he did not report feeling such pain to any doctor. *Id.* at 204, 998 P.2d at 1117. Approximately six weeks after injuring his knee, Mr. Duncan went swimming. While swimming, his injured knee continually locked up. The next day Mr. Duncan felt excruciating pain in his lower back. *Id.* at 203, 998 P.2d at 1116. One doctor opined that Mr. Duncan had ruptured a disk in his lower back. *Id.* The Commission awarded Mr. Duncan compensation for the treatment related to his back injury and this Court affirmed.

I write to point out that Mr. Duncan did not argue that, and this Court did not address whether, he was entitled to compensation for a new and distinct injury (the ruptured disk in his back) if that injury had occurred while he was swimming, because its cause could be traced back to his workplace accident via this path: but for the accident his knee would not have locked up while swimming; but for his knee locking up while swimming, he would not have injured his back. This Court simply found substantial, competent evidence to support the Commission's

determination that Mr. Duncan's back injury was caused by his accident because there was evidence that his back was injured before he went swimming. One doctor testified that hip and leg pain are consistent with having suffered a ruptured disk in the lower back. *See id.* at 204, 998 P.2d at 1117. That doctor conceded that if the Commission believed Mr. Duncan had experienced such pain in the timeframe between the accident and the swimming episode, the doctor would be willing to attribute the back injury to the industrial accident. *Id.* Mr. Duncan testified that he had experienced such pain and his testimony was supported by that of his girlfriend. *Id.* This Court found such testimony sufficient to affirm the Commission's award.

I am concerned that the majority's statement that a new and distinct injury that emerges sometime after an accident may be compensable if its cause can traced back to the accident itself may be interpreted as this Court expressing a new view of what is compensable in workman's compensation cases. While an apt description of the circumstances in *Duncan* and *Anderson*, this Court did not use that language to describe the applicable test for causation in those cases. Indeed, the Court did not use that language in *Duncan* or *Anderson* at all. I write simply to clarify my understanding that today's opinion does not change the standard of causation a claimant must establish in order to receive compensation for a particular injury under Idaho's Worker's Compensation Act; nor does it expand the scope of the injuries compensable under that Act.